Good afternoon, and may it please the Court. My name is Sarah Stetler, and I represent Stephen Catlin, the petitioner appellant in this case. I'd like to reserve eight minutes of my time. Eight? Eight. We'll try to help you, but keep your eye on the clock. Okay. Sounds good. This case is a microcosm of the flawed capital punishment system in California. Stephen Catlin will be 80 years old later this year and has been incarcerated for these crimes for almost 40 years. In 1986, Mr. Catlin was convicted and sentenced to life without parole for another crime, and if either the convictions or the sentence in this case were reversed, Mr. Catlin would still be serving that life without parole sentence. It took almost two decades, 17 years, for Mr. Catlin's state direct appeal and habeas corpus petition to be decided by the state Supreme Court without the benefit of any factual development or evidentiary hearing. Another dozen years passed before the district court denied Mr. Catlin's petition without allowing him to fully develop the facts or granting him an evidentiary hearing in support of any of those claims. The present case could have been resolved in a myriad of ways over the last few decades, yet we are here today discussing the unconstitutional errors which resulted in Mr. Catlin spending close to half of his life on death row and which could result in further years of litigation depending on the outcome of this argument. Yet if this case were ended today, Mr. Catlin would continue serving his life without parole sentence. Ten years ago, when seeking further factual development in the district court, Mr. Catlin urged the court to move the parties towards some form of expedited resolution to no avail. There were many points along the path of litigation where the state court could have agreed to resolve this case and save the strained judicial and taxpayer resources, but they did not. Council have reached out to Respondents' Council as recently as yesterday regarding a settlement in this case that would end this litigation while leaving Mr. Catlin. Counsel, this is all interesting history, but a lot of it doesn't seem to be before us. We've got discreet issues that are before us. It would be helpful if you could walk us through what you think your strongest argument. Sure. Yes, Your Honors. As I was saying, as I prepared for this argument, I was just amazed at the amount of time that has gone into this case without ever having any serious factual development or any hearings below to expand the record and get a better sense of some of these claims. Forgive me, I want to follow up on my colleague's question because part of your problem is whether AEDPA applies. I would like to know right off the bat whether you contend that AEDPA governs this case, and if so, why? Well, Your Honor, that is a good starting point. That's the underlying law that we deal with, right? So Mr. Catlin's position is that there was no adjudication on the merits from the California Supreme Court to which AEDPA deference would be given. You make that argument in your reply brief, and our case of Ochoa v. Davis says that's a no-winner, right? And if that's the case, then our next position would be that there was an unreasonable application of clearly established federal constitutional law. Which is in this case, and my colleague asked the question, so following up what he said then. Which in this case is Strickland. What? Which in this case is Strickland. Okay, all AEC claims, right? Yes. Okay. But it's all on failure to investigate. On failure to investigate and present information that, so there was a number of items that post-conviction counsel added to the record that were not in the possession of trial counsel, but we also found multiple instances. Okay, but so let's just walk, let's take those, Siri, out. Sure. If you find evidence that trial counsel didn't have, then this whole question before us is whether trial counsel was ineffective in not discovering that earlier, right? I mean, obviously he can't be ineffective in failing to consider it if he didn't know it. So our question is, should he have found that out? Yes, your honor. Our position is that the, much like the U.S. Supreme Court has found when there are items in counsel's possession which have red flags. Okay, so what was it in his, what was in counsel's possession that in your opinion he should have investigated more than he didn't do? Two things jumped to mind that were in trial counsel's possession that should have flagged him to do further investigation. The Wasco High School records of Mr. Catlin, when his adoptive parents sent him to Wasco to live with John Brown, who was a convicted and known pedophile, also a police officer in the small town of Wasco, um, that would have led to the, um, information that would be, um, very persuasive to most jurors on, um, the sexual abuse that Mr. Catlin was subjected to throughout his time living with Mr. Brown. So you believe that if a convicted murderer was subject to sexual abuse in his youth, they should not be able to get the death penalty as totally unwarranted? That's not the position. It's, what our position is, um, Ninth Circuit law and U.S. Supreme Court law has found time and again that the most powerful mitigation evidence, um, presented to jurors is evidence of, um, childhood trauma, in particular childhood sexual abuse, um, as well as brain damage, um, drug and alcohol abuse. But why is that sexual abuse a mitigation? I just don't understand that part. Why is it mitigating? Yeah, why is it mitigating? Jurors tend to, um, take the side of, of small children, or in this case, uh, teenage children, um, who don't have the ability to consent to, um, the abuse that, that Mr. Catlin in this case was subjected to. Why does that excuse the murder of three people? Well, mitigation evidence is, is really not about excusing, um, conduct. It's about explaining conduct. And in this case, we had two jurors who at the end of, um, trial both gave declarations as to, um, the expectation that they had for mitigating evidence. See, I guess that's the problem. You're suggesting that it explains that the, the sexual explains why he murdered three people, but then that is almost aggravating evidence. It shows that he might murder more people in the future. And it seems that the counsel's take of that he's, uh, uh, he's not a threat in society, he's adjusted in prison, and he's rehabilitated does seem like the stronger mitigating evidence. And so this would be contradictory to that. Well, our position, Mr. Catlin's position is that, um, good guy evidence of the type that was presented here typically is, um, of little value when the facts of the crimes, um, such that they are here with multiple, um, bodies, a wife, adopted mother. That may all be true, but as my, my colleague is implying here, I mean, the reality is this was a strategic decision made by counsel to show what a three or four things that he pointed out. It's a good guy in prison, helped everybody, everybody thought it was nice. And that's directly opposed to bringing in evidence about childhood sexual trauma and the, and the implication that he would continue to act out and kill people. So if it's, if it is a strategic decision that was made, how can you say that that is a violation of the first decision? Then it would be hard to argue. Um, how could it be? Otherwise, if, if case law from the Ninth Circuit and the U. S. Supreme Court shows that if you have not done a full investigation into the available mitigating evidence, then you cannot have an informed decision making process. Um, so it's hard to, to have a trial strategy if you've not first done the investigation And what particular case are you referring to that is the progeny of Strickland that would fit what you're just describing in this case? So, I mean, Wiggins, Porter, um, Williams, um, going back to Lockett. Um, I mean, if, if we were to go into the briefing, I, so I see Williams, Ainsworth from this Um, all of these go back to, um, the responsibility of trial counsel to make a full investigation before making any decisions. But, I mean, you know, I learned an early lesson. I wrote Penholster and I know what, what the Supreme Court looks for and how it applies to AEDPA. And it, unless, unless there's some staggering evidence that was missed, uh, I'm having trouble thinking of any case that would allow you to say this was not a strategic decision on the part of counsel. Try to present Mr. Katelyn as a good guy, if you will, a reformed good guy dealing with people nicely. And if you bring in the sexual abuse context and the implication is from that testimony that he killed some more people, like my colleague suggested, um, it's hard to see where a jury, well, you can't say exactly what the jury will do, but it's hard to see how that was anything other than a strategic decision. Why am I wrong about that? Well, I wouldn't ever say, uh, Your Honor was wrong about anything. That's very nice. But what I would say is that the, the billing records of, um, Attorney Delastrito who handled the penalty phase in this case, um, show that he did not put in very much time. Um, the counsel and, and, and Pentholzer spent six hours in total preparing for the, um, penalty phase. And there were all kinds of issues. The kid had been run over by his mother. He went through the windshield, on and on and on and on. Never went in. Supreme Court reversed. Said, no problem. That's enough. How do you get past it with this? Well, I, I think in this case, um, the, the fact that there are, um, instances as we, um, discuss the alcohol abuse, drug abuse, the, um, brain damage, the, um, exposure to neurotoxins that led to the brain damage, the sexual trauma, all of these things have been... You would agree that if those had been investigated and they presented it, counsel would have had to raise a different theory of the case. So, aren't, at the end of the day, isn't that what you're questioning is you're saying, well, he should have raised a different theory of the case. He couldn't have argued he's good above board, but he's also justified in making all these decisions because of his, these past traumas. Typically, I would not expect to see a good guy defense along with the mitigation case that we're discussing, but our position is that the good guy defense was unreasonable in this case. Well, it didn't work. So, I, I give you that, but, but we're always going to be faced with that where, because you're always going to be coming up in this posture where what the trial counsel did, didn't work. And you're saying, well, we should have done something else. But it seems as Judge Smith has already questioned you on, the Supreme Court said, we're not going to do that. We're going to rely on counsels. We're going to assume that they've made a good faith basis to make a strategic decision. They have to make all these decisions all the time. And yet hindsight's 20, 20, you know, it's like you, you, you know, you, you threw the pass in the end zone and you missed it. So everybody says you should have run the ball. Yeah, maybe, but we don't know. And the strategic decision was made and it, it didn't work, but I don't know why it wasn't. I mean, he is a good, he's, you don't get a lot of these defendants who have had such a stellar history in, in, you know, in prison and things like that. So I don't know why it was unreasonable to take that as a, as a potential defense. To your point, I would also point out that Mr. Catlin, though he's now wheelchair bound and has been for the last 10 years, but over the past 40 years, he has been right up free and, you know, basically a good prisoner. That seems like a good strategy to present to the jury. I just think given the, the facts of the, if the facts were not as bad as they were in this case, a good guy defense might be appropriate. But in this case, it flies in the face of what the jury has just decided upon that I'm guessing if they were surveyed right after the conviction came down, no one would say Mr. Catlin's a good guy. So I think in that case, there needs to be some sort of explanation. And the, the declarations from the jurors after the trial showed that they were expecting to see something along the lines of, you know, hearing about adoption and school and psychiatric reports. That's all well and good. But you have something unusual in this case. You have a prior murder conviction. You've got admission. You killed these people. You got fingerprints. You got overwhelming evidence. And as you know very well as able counsel, there are two parts to Strickland. The first part showing that there was a failure to meet even minimum standards of professional conduct and, in this case, extremely important, that it was prejudicial. And I think more than anything else in this case, I don't see how you establish prejudice. It's such a staggering case. You know, Paraquat poisoning, three people, wow. Fingerprints on, you know, on the Paraquat. I mean, he got life insurance, got other, it's all there. And that wasn't even questioned. So what you're talking about is whether that person, self-confessed murderer, et cetera, et cetera, et cetera, gets a break because he had some childhood trauma. Admittedly, significant. But I don't see how you can show prejudice for that. What am I missing? Well, I think Your Honor is speaking to, at the guilt phase, certainly the... Well, not just the guilt phase, but moving on from there. When you get to the penalty phase, you still bring in this evidence. What did he do? And the circumstances and the agony of these people suffered when they died. The fact that he got money, et cetera, et cetera. That's all part of the penalty phase. All of it. And what you're suggesting, and again, you're just doing your job, but you're suggesting that because he had a difficult traumatic experience and molested, that's awful stuff. It really is. But how can it possibly overcome what wasn't even questioned? It was admitted that these other things occurred. And to that, Your Honor, I would say under Strickland and its progeny, only one juror needs to be impacted by this mitigation evidence. And we had two jurors who, after the fact, said, we were expecting to hear something about psychiatric problems. Something that kind of explains how something... They didn't say they would have ruled otherwise. They just said they were expecting... No, no. And I'm not saying they... I'm saying that they were primed through the voir dire and the death qualification to expect that there was going to be something along the lines of mitigating evidence that might give some context to how someone could do something like this. And after the trial ended, and none of that had been presented, and instead, this good guy defense, which again, not to discount that there is some power to saving somebody's son and being a good friend and institutional adjustment. All of those things are appropriate in certain cases. But in this case, given the facts as you stated them at the guilt phase, it seemed like the jurors were expecting something like brain damage, like exposure to neurotoxins and alcohol and sexual trauma, etc. And not that that excuses or justifies anything, but it might explain to those jurors... Again, you're a good lawyer. You're doing what you need to do. But you've given us the scattergun approach. We see it all the time in capital cases. You throw everything up on the wall and see if anything sticks. What's your best argument as to what you think sticks in this case? In terms of the issue? What's your best claim? What's your best argument? You've made lots of them. So in terms of the issue or claim or... What's your best claim? In other words, you've got three judges here. We've read the materials. We know what the case is about. We've read the briefs. We've read the cases and so on. Based on that, what is your best argument that you think is going to convince this panel that your client ought to get some relief under that AEDPA standard? So I think Mr. Catlin's best issue is the ineffectiveness at trial counsel at the penalty phase for failing to investigate. And from your perspective, which claim is that? You're talking about 23? You're talking about 35? Probably 35, right? I think that's 35, yes. And which subpart? You got A through F. Which one? I believe F. That's cumulative, right? Yes. So all of the above. They're kind of back to the same thing. So basically, you're just saying it's an ineffective assistance of counsel claim and that we as a panel should look at the Strickland standard in this case, whether the counsel made an inappropriate strategic decision and whether or not that happened, whether there's prejudice. Is that your position? That's our position. And I believe that had the California Supreme Court granted an OSC or allowed further factual development, there may be more of a record to present to the court. But you can't build a new record based on pinholes. You can't go back and create the record again, right? You got what you got. Yes. If the post-conviction counsel was diligent in attempting to build the record and the state Supreme Court failed to allow that, then the district court could have allowed factual development there but did not. So at this point, we have what we have. And the district court also and respondents point out that in some areas, the record could have been more fully developed. And our position is that we tried. We were not allowed by the state Supreme Court nor the district court. You got nine minutes and some seconds left. You want to keep that? You said eight minutes. But if you're on a roll, go ahead. But if you want to come back in a minute. If you have further questions, I'm happy to take them. Otherwise, I'll reserve my time. Very well. I think let's do that. Thank you. All right. Let's hear from. How do you say? Show color. Is that correct? Okay. May it please the court. Kenneth Sikoler, Supervising Deputy Attorney General for the I'll start by addressing the claim that occupied the discussion of the last few minutes, which is specifically the claim of ineffective assistance at the penalty phase for failure to present social history. And the claim involves a failure to invent to present evidence of social history. And I think in the last few minutes, there's an even more fundamental reason that the state court was reasonable under Section 2254D in dismissing the claim. And that is that Mr. Catlin has identified no witness who would have testified about that evidence, about his own about his parents' history and a claim of failure to present. Can I ask, though? So Brown, as I understand it, died in 1988. I don't. I don't know. But I mean, he did speak to investigators about the sexual abuse, right? According to the report. Yes. So your argument is when did the happen? Can you remind me? This trial was 1990. Okay. So so that your argument is because Brown had died, he wouldn't have been able to come in and testify. But if he had signed an affidavit, could they have preserved the evidence in some way that this could have been presented to the jury? Does he? I mean, he obviously would have. Yeah, I get your point. He would have been unavailable. The question, it still would have to have it still would have had to have a foundation. And without analyzing that more carefully under the California Evidence Code, I can't say for sure. And that's the only hesitation I have with your argument there is I'm just not that seems a little bit more complicated. The easier route here seems to be just saying, look, we're going to accept that all this was out there, and it just doesn't satisfy it. Are you asking us to get take a more narrow procedural view on that? I'm I think that both approaches are correct. I'm I'm adding to the argument. Yeah. But why couldn't Mr. Catlin testify to it? He didn't testify at the penalty phase. But he could have. Well, I guess. Yes, he could have. He had testified at the guilt phase. And the point I was going to make in response to the last question was, even if Brown was no longer available at the time the habeas petition was filed or at the time of trial, Mr. Catlin knew what happened to him. And he has never executed. He didn't testify at the penalty phase. He has also never executed a declaration describing what happened to him. Is there or is there evidence in the investigatory notes that counsel talked to? I mean, they obviously heard this from Brown. Did they follow up with Catlin specifically to say, hey, we heard this from Brown. Can you confirm or deny this? Or we just don't know. We don't know from the record we have, but we certainly can assume that Catlin talked with his attorneys and he could have executed a declaration in the state stating what he did and did not talk about with them, what they did and didn't ask him. So he certainly had the ability to provide that evidence, which is required for an ineffective assistance of counsel claim. And he didn't do that. And in fact, as I noted in my brief, his failure to do so when he had that information leads to an inference that he didn't do so. So what's the point of that, that you're saying that he wasn't, in fact, sexually abused or you're just saying that he would have no evidence to prove it up? He hasn't shown that he would have any evidence to prove it up. And he hasn't shown any competent evidence for the purpose of the habeas corpus proceeding. The habeas corpus claim for IAC for failure to introduce evidence at trial, introduce testimony at trial, has to show, has to identify the evidence and identify admissible evidence that would have come in. And he has never done that regarding the claim of sexual assault or any of the other claims for the penalty phase. So basically, from your perspective, in terms of the evidence required to even make a claim of IAC, there's no there there, because there's no evidence that was ever introduced. Correct. I agree with the notion that was at least floated during the argument of Pelland, that by the court, that it would be reasonable in any event, in view of the strategy that the defense did adopt at the penalty phase, to refrain from presenting evidence of sexual assault. And in fact, I think this is exactly the kind of situation in that sense that the Supreme Court was talking about in the Dunvey Reeves case when they said that a state court isn't obliged to accept a petitioner's blanket assertion on an incomplete evidentiary record that no reasonable strategy could have supported counsel's failure. And in here, the record, the evidentiary record is incomplete, and it's the evidence. And he could have done so here. In addition... I gather you take the position that since he is still alive, and certainly was at the time of the penalty phase, he could have put on evidence himself, testified, I wish my blessings on, even if his persecutor, if you were, was not still alive, he still could have made that statement, right? He could have. Even if there was no other evidence available, he could have taken the stand, and he could have also executed, provided declarations to fill on the blanks regarding his habeas corpus claim. Are there any cases that... First of all, are there any cases... What's the case that has granted a petition for ineffective assistance of counsel? I mean, they say to Wiggins, Williams, Porter, and Lockett. I mean, can you address those and explain why they don't apply here? I can't address the specific facts of them, although Wiggins pointed out that in reasonableness, you know, that the reasonableness of the investigation is a part of the reasonableness determination. But in that case, the petitioner identified the evidence that counsel could have found and introduced. And in this case, Catlin hasn't identified any admissible evidence that could have been introduced regarding the sexual assault. And so... This is just kind of a side question, but it kind of, for me, frames what we're dealing with here. Have you ever been involved in defending a capital case where there was not an IAC claim made? No. It's always made, isn't it? No. The only ones I know that don't have an IAC penalty phase claim, or perhaps an IAC claim, are the ones where the defendant was pro per, which are few and far between. But to answer what I think the court is asking, no. It's just de rigueur. It's what you always claim. Always, always, always. That is correct. And the Supreme Court, which, of course, we're subject to, is pretty leery of those kinds of claims. You have a real burden to show that what counsel did or didn't do was outside the mainstream of legal performance. And then you've got to show prejudice. And that's what I struggle with in this case. If you'd gone through and it was a perfect world, could you find little individual things you could do? Maybe. But that's not the standard here. The question is, within the community that represents capital defendants, was this so outside the pale that it just is inexcusable? And I'm not seeing that. Correct. The question is whether a reasonable defense counsel could have made the decision that defense counsel did. But even more, because this is under Section 2254d, it's under what the Supreme Court has called the double deference standard, which is whether a reasonable jurist could find that a competent attorney would make that decision. And to frame my argument, I do agree that a reasonable, even if the evidence of sexual abuse at a younger age was admissible, a reasonable state court could that a reasonable defense attorney could decide not to introduce that evidence under the idea that it doesn't support the rest of the penalty phase defense, which I would take a little issue with calling it the good guy defense. I've heard that term before. I would say more accurately that it has enough redeeming qualities that his life is worth sparing defense at the risk of stacking modifiers in a way that I would hope no one would do in a brief. Ever heard that word, stacking modifiers? Stacking modifiers. That's interesting. Okay. So I think it fails on a couple of issues. One is, you know, the first one I think to look at is he simply has not met his duty to present, to introduce the evidence needed to support the claim. And secondly, even if we were to go beyond that, a reasonable jurist could find that counsel's decision were reasonable. And what's more, certainly a reasonable state court could find no prejudice, even if there was admissible evidence, given, again, the nature of the crimes and the evidence that they did introduce, which included evidence of the role Mr. Catlin had played in the lives of some other people, the fact that he had saved a child's life, and his unusually successful adjustment to incarceration in state prison. Unless the court has any questions about the other issues, and that would be the other ineffectiveness at the Brady claim, the related ineffective assistance of counsel related to the Brady claim, and the claim regarding an ex parte conversation between the court and a juror, unless the court has any questions about any of those, or further questions about this ineffectiveness claim, I'll submit. Any other questions, Monica? I think not. Very well. Thank you, Your Honors. Okay. All right. So, Mr. Steller? Thank you, Your Honor. So, as to my colleague's point about Catlin could have taken the stand to explain the sexual abuse, obviously, if trial counsel had wanted to pursue a typical mitigation case, that would have been one avenue. We don't know whether or not trial counsel had even spoken to or pursued this with Mr. Catlin. I thought the government's argument is that that could have been presented at the habeas stage, too, and why was that not presented then? So, we have the investigator's report, which is a statement against interest from Mr. Brown. Typically, with issues of sexual trauma, sexual abuse, a lot of clients, especially those that remain incarcerated, are very loathe to discuss any of that for obvious reasons while they're incarcerated. So, our position is that we have the information necessary, and we've included that in the habeas petition. But, again, because trial counsel decided not to pursue this type of defense, it ended up with what I think many courts, including the Ninth Circuit, have called the good guy defense in a case when that really wasn't what would impact a jury. That's what didn't impact the jury, but that was certainly part of the, if you will, mitigation defense, right? Yeah. So, I mean, it clearly was all of the marbles were in the bag of the good guy defense, and the question is whether that was reasonable for counsel to do and whether there was prejudice in that, you know. And that's where I think we all struggle with this. I mean, this isn't the perfect lawyer issue. The question is the reasonable lawyer, right? And there's a double deference here, as your opposing counsel pointed out. Maybe counsel shouldn't have gone with the, in quotes, good guy defense, but he did. And it didn't work, but that doesn't mean there was something else that would have worked. And I believe you're asking us to say that that strategy was so far outside the mainstream that prong one is satisfied. Isn't that your position? Our position is that reasonableness can't be properly evaluated when you haven't done the work to investigate and see. Well, sure, because you're claiming that he was deficient for failure to discover and apply these things. Yeah. So my point is he couldn't have made a reasonable decision because he hadn't done the legwork of investigating and seeing everything that was available to present in mitigation. And this was the type of evidence that at least two jurors said they were expecting to see, but did not see. But I thought counsel did know about the John Brown allegations. Yes. So what did counsel need to do at that point? If he just made, if counsel was making that strategic decision to go with a good guy defense instead of this mitigation, the fact that he knew that, what more did he have to know? So with the John Brown, that was information that was available. Whether he read that investigator's report, I don't know. Whether he looked at the high school records, I don't know, because trial counsel did not cooperate with post-conviction counsel. So we was going through. So we know that these records with the red flags were in their possession. Whether they made a decision not to follow up on that is something that we cannot know. The adoption records also were in their possession, but we don't know whether, what, if anything, was done with that. But like, for example, if there was a letter in the going forward, and so therefore I'm going to disregard it, then you would have no argument, correct? At that point, I think the court would look at that and say that's a strategy which Strickland protects. But then now under AEDPA then, you're just asking us to speculate then, because there's nothing contrary to that. Well, under AEDPA, what I'm saying is there's no evidence that they investigated all of the reasonable red flags that the Supreme Court tells trial counsel to investigate. Right. So we're supposed to put all these pieces and speculate that he did nothing with it and didn't investigate it, didn't ignore it without a strategic reason. I just don't think we could do that under AEDPA, that level of speculation. Well, that's Mr. Catlin's position, is that it's clear from the record that there was evidence, mitigating evidence, that would have made an impact on at least one juror that was available to trial counsel, and they failed to investigate that or present it. Unless there's anything further? I think not. Thanks to both counsel. We appreciate your efforts on these. These cases are challenging. We appreciate you're doing your job well. It helps us. And the court stands adjourned for the day. By the way, the case is submitted.
judges: SMITH, NELSON, BUMATAY